Jeff D. Friedman (173886)
Shana E. Scarlett (217895)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
jefff@hbsslaw.com
shanas@hbsslaw.com

Steve W. Berman (*Pro Hac Vice pending*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| DAVID WENTWORTH, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff <br><br> v. <br><br> LUCASFILM LTD. LLC.; PIXAR; DREAMWORKS ANIMATION SKG, INC., THE WALT DISNEY COMPANY; SONY PICTURES ANIMATION INC.; SONY PICTURES IMAGEWORKS INC.; IMAGEMOVERS LLC; IMAGEMOVERS DIGITAL; and DIGITAL DOMAIN 3.0 INC. <br><br> Defendants. | No. <br><br> <u>CLASS ACTION</u> <br><br> COMPLAINT <br><br><br> <u>JURY TRIAL DEMANDED</u> |

010177-12 722173V1

**TABLE OF CONTENTS**

I.     INTRODUCTION ..................................................................................................................1

II.    JURISDICTION AND VENUE............................................................................................2

III.   THE PARTIES ......................................................................................................................3

IV.    RELEVANT FACTS.............................................................................................................4

       A.    The Conspiracy...........................................................................................................4

       B.    Expansion of the Conspiracy......................................................................................7

       C.    The Breadth of the Conspiracy...................................................................................9

V.     HARM TO COMPETITION AND ANTITRUST INJURY................................................10

VI.    STATUTE OF LIMITATIONS ...........................................................................................12

VII.   CLASS ACTION ALLEGATIONS....................................................................................13

VIII.  INTERSTATE COMMERCE .............................................................................................15

IX.    VIOLATIONS ALLEGED .................................................................................................15

Plaintiff David Wentworth individually and on behalf of those similarly situated, by and through his counsel, brings this Class Action Complaint ("Complaint) against Defendants LUCASFILM LTD. LLC ("LUCASFILM"); PIXAR, DREAMWORKS ANIMATION SKG, INC. ("DREAMWORKS"); THE WALT DISNEY COMPANY; SONY PICTURES IMAGEWORKS, INC.; SONY PICTURES ANIMATION INC. AND SONY PICTURES IMAGEWORKS, INC. ("SONY"); IMAGEMOVERS LLC; IMAGEMOVERS DIGITAL ("IMAGEMOVERS"); AND DIGITAL DOMAIN 3.0 INC. ("Digital Domain"); on personal knowledge with respect to himself and his own acts, and on information and belief as to other matters, alleges as follows:

## I. INTRODUCTION

1. Visual effects and animation studios, including Lucasfilm, (including its division Industrial Light & Magic), Pixar, DreamWorks, The Walt Disney Company (and its division Walt Disney Animation Studios), Sony, ImageMovers, Digital Domain, and others have engaged in a long-running conspiracy to suppress the wages of their highly skilled workers and employees.

2. These workers consist of animators, digital artists, software engineers, and other technical and creative workers who have dedicated their efforts, energy, and careers to produce major motion pictures. These workers were deprived of hundreds of millions of dollars in compensation that the Defendants instead added to their profits.

3. The conspiracy originated with Pixar and Lucasfilm. Originally, the terms of the conspiracy included non-solicitation (the "non-solicitation agreement") of each other's employees. Specifically, the two companies agreed that they (1) would not cold call the other's employees; (2) would notify the other if a job was offered to the other's employee (assuming that the candidate unilaterally applied to the job opening on their own); and (3) would not increase compensation to lure the employee if the original employer matched the amount in the job offer.

4. The conspiracy later grew to include the other Defendants. As Ed Catmull, President of Pixar, explained, "[w]e have avoided wars up here in Norther[n] California because all of the companies up here – Pixar, ILM, DreamWorks, and couple of smaller places [sic] – have conscientiously avoided raiding each other."

5. The leaders of the conspiracy enforced and policed violations of the agreement, even when it did not involve solicitation of their own employees. When ImageMovers began recruiting workers from other companies in 2007, Catmull intervened and stopped them – despite the fact that Catmull knew they would not target Pixar employees. Such recruitment would have "mess[ed] up the pay structure."

6. Moreover, the subject of the conspiracy extended beyond the non-solicitation agreement; it also included agreements to set and suppress wage ranges for similar job titles. The conspiring companies would meet, discuss, and communicate with each other throughout the year. These discussions would occur during lunches, dinners, drinks, or other informal meetings. The purpose of these communications was to suppress wages and to prevent an all-out bidding war for workers that would eat into corporate profits. While protecting and enhancing these profits, Defendants through their conspiracy, deprived Class Members of hundreds of millions of dollars' worth of compensation for which Plaintiff and the Class Members now seek.

7. The non-solicitation agreement was kept secret from the studios' employees. Although many discussions relating to the conspiracy took place, company officials insisted that the non-solicitation agreement not be put into writing.

8. The conspiracy unreasonably restrained trade in violation of the Sherman Act, 15 U.S.C. § 1, and the Cartwright Act, Cal. Bus. & Prof. Code §§ 16720, and constituted unfair competition and unfair practices in violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.* Plaintiff, on his own behalf and on behalf of the Class as defined herein, seeks to recover the difference between the wages and salaries that Class Members were paid and what Class Members would have been paid in a competitive market, and to enjoin Defendants from continuing their unlawful agreements.

## II.     JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction over this action under 15 U.S.C. §§ 4 and 16, and 28 U.S.C. §§ 1331 and 1337. This Court also has supplemental jurisdiction under 28 U.S.C. §§ 1367 because the California state law claims under the Unfair Competition Law are part of the same case or controversy.

COMPLAINT – No.

010177-12 722173V1

2

10. This Court also has personal jurisdiction over the Defendants because each resides in or has its principal place of business in the state of California, employed Class Members in California, and a substantial part of the conspiracy was entered into, carried out, and took place in California.

11. Venue is proper in this Court pursuant to 15 U.S.C. §§ 22 and 28 and 28 U.S.C. § 1391(b), because substantial parts of the anti-competitive conspiracies occurred in this judicial district. Assignment to the San Jose division of this Court is also appropriate because the underlying antitrust lawsuit against several of the world's largest technology companies is currently pending in the San Jose division before The Honorable Judge Lucy Koh. Under Local Rule 3.2(c) and (e), and under the principles of judicial economy, this lawsuit should be before the San Jose division.

### III.     THE PARTIES

**A.     Plaintiff**

12. Plaintiff David Wentworth, who resides in California is a former employee of Defendant ImageMovers Digital. Plaintiff Wentworth began employment at ImageMovers Digital in June 2007 in the role of Production Engineer. He was promoted to Lead Production Engineer and eventually to Associate Computer Graphics Supervisor. Plaintiff Wentworth was victimized by the anti-solicitation conspiracy between and among the Defendants, resulting in his having lost compensation.

**B.     Defendants**

13. Defendant Lucasfilm Ltd. LLC ("Lucasfilm") is a California Corporation with its principal places of business in California located at 1110 Gorgas Avenue, San Francisco, California 94129. Industrial Light & Magic ("ILM") is a division of Lucasfilm. Since 2012, Lucasfilm and ILM have been owned by the Walt Disney Company.

14. Defendant Pixar is a California corporation with its principal places of businesses in California located at 1200 Park Avenue, Emeryville, California. Since January 2006, the Walt Disney Company has owned Pixar.

15. Defendant DreamWorks Animation SKG, Inc. ("DreamWorks") is a Delaware Corporation with its principal place of business located at 1000 Flower Street, Glendale, California.

COMPLAINT – No.

3

1   DreamWorks also operates and maintains a studio in Redwood City, California, in Santa Clara
2   County.
3       16.    Defendant The Walt Disney Company is a Delaware Corporation with its principal
4   places of business in California located at 500 South Buena Vista, Street in Burbank, California.
5   Walt Disney Studios is a division of Disney with its principal place of business located at 500 South
6   Buena Vista Street, Burbank, California. Walt Disney Studios oversees the operations of both Walt
7   Disney Animation Studios, and since 2006, Pixar. Walt Disney Animation Studios is a division of
8   Disney with its principal place of business located at 2100 W. Riverside Drive, Burbank, California.
9       17.    Defendant Sony Pictures Animation, Inc. is a California Corporation with its principal
10  places of business in California located at 9050 W. Washington Blvd., Culver City, California.
11      18.    Defendant Sony Pictures Imageworks, Inc. is a California Corporation with its
12  principal places of business in California located at 9050 W. Washington Blvd., Culver City,
13  California.
14      19.    Defendant ImageMovers, LLC is a California Corporation with its principal places of
15  business in California located at 1880 Century Park East, Suite 1600 in Los Angeles, California.
16      20.    Defendant ImageMovers Digital is a corporation of unknown origin with its principal
17  place of business located at PO Box 10428, San Rafael, CA 94912. Prior to January 2011,
18  ImageMovers Digital's principal place of business was located at 9 Hamilton Landing, Novato,
19  California.
20      21.    Defendant Digital Domain 3.0, Inc., also doing business as DD Digital Domain 3.0,
21  Inc., is a Delaware Corporation with its principal places of business in California located at 300 Rose
22  Avenue, Venice, California and 12641 Beatrice Street, Los Angeles, California.

### IV.   RELEVANT FACTS

**A.   The Conspiracy**

25      22.    Defendants are companies that create visual effects and animation for movies. Not all
26  studios have the capability to provide these highly sought-after services. This type of work requires a
27  large number of skilled workers – animators, graphic artists, software engineers, and others – to
28  create and produce these visual effects. These highly capable workers themselves undergo extensive

COMPLAINT – No.

4

010177-12 722173V1

1    training or schooling to gain the necessary skills needed to operate specialized software and other
2    necessary tools. The visual effects and animations they create eventually make their way into movies
3    produced by the major motion picture studios, including Universal Pictures, Warner Brothers, and
4    20th Century Fox.

5        23.    Visual effects and animation studios normally recruit skilled technical and creative
6    workers through a process called "cold calling" where an employer would contact a competitor's
7    employees and offer them a comparatively attractive compensation package. These offers would then
8    cause the recruited employee to either (1) change jobs and gain better compensation or (2) remain at
9    their original employer but negotiate better compensation to match the competitor's offer. Word of
10   the offers would spread, and often would lead to higher compensation for similar employees in the
11   company.

12       24.    The conspiracy between Lucasfilm and Pixar began sometime in the mid-1980s, when
13   George Lucas (former Chairman of the Board and CEO of Lucasfilm) and Ed Catmull (President of
14   Pixar), along with other company executives, entered into an express non-solicitation agreement. The
15   specifics of the original agreement between Lucasfilm and Pixar are as follows:

16       a.    First, each company agreed that they would avoid direct solicitation (including
17   cold calling) and recruiting of each other's employees. For example, in 2007, Pixar contacted
18   Lucasfilm twice to discuss suspected violations of the non-solicitation agreement. Lucasfilm then
19   responded by altering its conduct to conform to the agreement.

20       b.    Second, they would have to notify each other when job offers were made to
21   the other's employee. Because direct solicitation of another company's employees was prohibited,
22   these offers would all come from the employee applying to the job opening on their own.

23       c.    Third, any offer by the new company would be final and was not permitted to
24   be "improved upon" by the previous company. For example, according to an internal Pixar e-mail,
25   "we agreed not to counter … It's a very small industry and neither Lucas or Pixar wants to get into
26   an issue of countering offers back and forth" and that they would "never counter if the candidate
27   comes back to us with a better offer."

28

COMPLAINT – No.

010177-12 722173V1

5

25. The lack of cold calling had serious consequences on employee compensation. Normally, compensation is opaque. Most employees do not know what employees at other companies are paid. Through cold calling and aggressive recruiting, however, employees can discover their own market value. Unfortunately, the non-solicitation agreement made compensation information less transparent.

26. Making compensation opaque would help suppress compensation, and was the underlying goal of the original non-solicitation agreement. According to George Lucas, the purpose of the agreement was to create a ceiling on compensation, and keep the visual effects industry out of "a normal competitive situation." Lucasfilm wanted to avoid bidding wars with other companies—a desire equally shared by Pixar. According to Pixar's Catmull, it would be ideal to avoid situations where companies in the industry hired away one another's employees because it would create "a substantial salary increase [and] … seriously messes up the pay structure."

27. The suppression of wages substantially impacts these creative workers. Although studios do employ some permanently salaried employees, many workers are independent contractors who are paid on an hourly basis. These workers often work for the studios for the length of a given project, which typically corresponds to the length of one particular motion picture. The length of these time periods range from a few weeks to up to three years. Many of these workers do not receive health benefits, and may be terminated at any time by the studio.

28. These workers also face substantial uncertainty with regard to their job security. Visual effects and animation studios regularly terminate workers after the end of a given project. Workers then have to find new jobs. During the time in which they are searching for new jobs, many workers are unpaid. Sometimes, they have to move to another state for the new job. And even when they are eventually hired, there is still uncertainty because of the chance that a given project will be delayed.

29. The conspiracy between Lucasfilm and Pixar was eventually investigated by the Department of Justice's Antitrust Division ("DOJ"). The DOJ found a *per se* violation of the Sherman Act because the agreement was "facially anticompetitive." According to the DOJ, the agreement "eliminated significant forms of competition to attract digital animator and, overall,

COMPLAINT – No.

6

substantially diminished competition to the detriment of the affected employees who were likely deprived of competitively important information and access to better job opportunities." The agreements, as explained by the DOJ, "disrupted the normal price-setting mechanisms that apply in the labor setting" and "were not ancillary to any legitimate collaboration."

30. The DOJ then filed civil complaints against Lucasfilm and Pixar in federal district court. As a result, both companies eventually entered into stipulated proposed final judgments with the DOJ, which stated that the companies will be enjoined from entering into such non-solicitation agreements in the future.

**B.     Expansion of the Conspiracy**

31. The conspiracy between Lucasfilm and Pixar eventually expanded to include a number of other visual effects and animation companies, including DreamWorks, Walt Disney Animation Studios, Sony Pictures, ImageMovers, and Digital Domain. For example, according to Catmull, Pixar "avoided wars up here in Norther[n] California because all the companies up here – Pixar, ILM, DreamWorks, and a couple of smaller places [sic] – have conscientiously avoided raiding each other." Defendants willingly participated in the conspiracy because they were concerned that "raiding [employees of] other studios has very bad long term consequences," namely, bidding up compensation and reducing corporate profits.

32. DreamWorks is and has been a member of the non-solicitation conspiracy since 2004. DreamWorks has, at a minimum, an agreement with Pixar, Lucasfilm, Walt Disney Animation Studios, and Digital Domain. At one point prior to February 2004, Steve Jobs and the CEO of DreamWorks, Jeffrey Katzenberg, discussed and entered into a non-solicitation agreement. That agreement reportedly "worked quite well," according to Pixar's Catmull. Catmull later informed Disney's Chairman Cook that "we have an agreement with DreamWorks not to actively pursue each other's employees. I have certainly told our recruiters not to approach any DreamWorks employees."

33. Walt Disney Animation Studios is and has been a member of the non-solicitation conspiracy since 2006. Disney has, at a minimum, an agreement with Pixar, DreamWorks, Lucasfilm, the ImageMovers Defendants, and Sony. After Disney acquired Pixar in January 2006,

the ongoing conspiracy expanded to include new animation companies (such as ImageMovers) who later became partners with Disney.

34.  Sony Pictures Imageworks and Sony Pictures Animation are and have been members of the non-solicitation conspiracy since 2004 or 2005. Sony has, at a minimum, an agreement with Pixar, Walt Disney Animation Studios, and Digital Domain. During 2004, Catmull met with Sony Animation senior executives to "reach some agreement" because Pixar's employees were becoming "really desirable and we need to nip this in the bud." Catmull eventually reached a "gentlemen's agreement" with Sony. Although Catmull later claimed that Sony did not honor this agreement, he did confirm that in 2004, Catmull "met with [Sony executives] and asked them to quit calling [Pixar's] employees."

35.  ImageMovers and ImageMovers Digital are and have been members of the non-solicitation conspiracy since 2007. ImageMovers has, at a minimum, an agreement with Pixar, Walt Disney Animation Studios, Lucasfilm, and DreamWorks. Earlier, the conspirators had concerns that ImageMovers was not abiding by the terms of the agreement, and was "raiding other studios." Catmull reassured Disney that he "knows that [ImageMovers] will not target Pixar, however, by offering higher salaries to grow at the rate they desire, people will hear about it and leave" and that he would meet with Steve Starkey, one of ImageMovers' founders. In 2007, ImageMovers set up a joint venture with Disney, and as a result, ImageMovers was required to abide by the non-solicitation agreement. According to Marjorie Randolph, ImageMovers' Senior Vice President of Human Resources, ImageMovers had agreed to the rules of the non-solicitation agreement.

36.  Digital Domain is and was a member of the non-solicitation conspiracy since 2007. Digital Domain has, at a minimum, an agreement with DreamWorks, Lucasfilm, and the Sony Defendants. Digital Domain's Head of Human Resources, Lala Gavgavian, had previously spent nine years working as a senior official responsible for talent acquisition at Lucasfilm. Gavgavian (along with others at Digital Domain) instructed Digital Domain employees to not cold call or otherwise recruit other Defendants' employees. If any employees of Lucasfilm, DreamWorks, or the Sony Defendants unilaterally contacted Digital Domain regarding a job application, that contact was reported to Gavgavian.

COMPLAINT – No.

8

010177-12 722173V1

37.     Defendants sought to expand the conspiracy beyond the visual effects and animation studios described here. For example, in 2008, Lucasfilm decided to include in the conspiracy a small, 20-person studio named Lightstream Animation despite the fact that Lucasfilm believed Lightstream was not "going to [have] a significant impact on our ability to recruit."

**C.     The Breadth of the Conspiracy**

38.     The conspiracy itself extended to matters beyond non-solicitation. The conspirators also sought to include activities and meetings that furthered the suppression of worker wages. Senior human resources and recruiting officials from each of the Defendant studios met on an annual basis to discuss job titles, compensation, and an industry survey.

39.     Once a year, the Defendants would meet to discuss the parameters of a compensation survey called the Croner Animation and Visual Effects Survey. (The survey reflected information relating to wage and salary ranges for the Defendant companies' workers, which was further broken down by position and experience level.) However, this meeting was also used as an opportunity to agree upon and set wages and compensation for the following year. Digital Domain's Human Resources department referred to this meeting as the "Salary Council" because its participants included officials from Lucasfilm, Pixar, DreamWorks, Disney, Sony Pictures, ImageMovers Digital, as well as from Digital Domain itself.

40.     These gatherings also created the opportunity to discuss salary, wage, or compensation changes at various companies. For example, during a Salary Council meeting in 2007, Pixar learned that ImageMovers Digital was recruiting employees of other studios by paying them higher wages. Catmull asked Disney's Chairman to step in: "The HR folks from the CG studios had their annual get together in the bay area last week. At that time, we learned that the company that Zemeckis is setting up in San Rafael [ImageMovers] has hired several people away from DreamWorks at a substantial salary increase."

41.     Defendants also participated in meetings other than the ones sponsored by Croner. Senior officials would meet in Los Angeles or the San Francisco Bay Area, or at industry events (including, but not limited to, the SIGGRAPH Conference, the International Conference and

COMPLAINT – No.

9

010177-12 722173V1

1   Exhibition on Computer Graphics and Interactive Techniques; and FMX, the Conference on
2   Animation, Effects, Games, and Transmedia).

3     42. In addition to these meetings throughout the year, Defendants also conspired with
4   each other through other channels. For example, Pixar's Vice President of Human Resources, Lori
5   McAdams, e-mailed her counterparts at DreamWorks, Sony Imageworks, Lucasfilm, Walt Disney
6   Animation Studios, and others, requesting and providing salary increase information. The end goal of
7   these communications was to suppress their workers' wages.

8     43. Sharing compensation information was not in the independent self-interest of each of
9   the Defendants. Without a previously agreed-upon decision to fix compensation, any studio that told
10  its competitors its own compensation information would be giving its competitors a distinct
11  advantage in competing for creative talent. The only explanation for such disclosure is that the
12  studios were engaging in a conspiracy to suppress compensation.

13      **V. HARM TO COMPETITION AND ANTITRUST INJURY**

14    44. Cold calling is an important channel of recruitment for valuable employees. Any
15  given visual effects or animation studio's pool of potential hires necessarily includes the employees
16  of its competitors. Moreover, because the most valuable, sought-after employees are those who are
17  not seeking new employment, it is incredibly challenging to reach them without solicitation.
18  According to Lucasfilm, "[p]assive talent [is] difficult to find." A company acting in its unilateral,
19  independent self-interest would undoubtedly cold call its competitor's employees.

20    45. Moreover, such solicitation would also affect compensation for other workers
21  throughout the company. Employees within a single studio often would spread information regarding
22  the compensation of other studios. As a result, visual effects and animation companies would pay
23  close attention to what competitors were offering candidates. For example, some companies would
24  preemptively raise the compensation of other employees to avoid developing a reputation for
25  underpaying its employees. Though the raise would reduce corporate profits, they would allow the
26  company to recruit the best candidates.

27    46. The free flowing nature of information regarding compensation would ordinarily
28  benefit and serve to raise compensation. However, the non-solicitation agreement made higher

paying opportunities more difficult to find, and thus, the agreement suppressed compensation for workers.

47. According to George Lucas, the purpose of the non-solicitation agreement was to avoid a bidding war with other companies because "we don't have the margins for that sort of thing." And as discussed earlier, Catmull, the former Pixar President, explained that raising salaries "seriously messes up the pay structure." By keeping the compensation levels suppressed, the visual effects and animation studios deprived workers of wages they would have received in a competitive market situation.

48. The damage caused by the non-solicitation agreements commonly impacted all employees at the Defendant visual effects and animation studios. Defendants believed that similar employees ought to be compensated at similar levels across employees and workers at different levels of the organization. Narrow wage and salary bands were fixed by Defendants for employees with similar job titles with the goal of maintaining internal equity. For example, Defendants fixed compensation in a way such that lead effects animators earned more than assistant effects animators.

49. Lucasfilm always deemed internal equity as one of the considerations in setting compensation. As a matter of course, Lucasfilm reviewed employee compensation to "align the employee more appropriately in their salary range" and to their "internal peer group." All compensation for new positions and adjustments for out-of-cycle positions were determined by an internal compensation committee that relied upon "Peer Relationship" data regarding how the subject employee's (or candidate's) colleagues were compensated.

50. Pixar engaged in similar comparisons. Recruiters would compare compensation for similar employees to make sure they were not "out of whack." A "consistent framework for evaluating the contribution of software engineers" was maintained and was used to justify changing salaries. One Pixar official stated that compensation that did not fit into this framework would "raise[] a bit of a flag."

51. Under information and belief, all other Defendants employed a similar pay structure and framework, and strictly adhered to their wage and salary ranges.

COMPLAINT – No.

11

010177-12 722173V1

Case3:14-cv-04422-JCS   Document1   Filed10/02/14   Page14 of 20

52. Defendants' non-solicitation agreement, and Defendants' efforts to maintain internal equity ensured that their conspiracy suppressed the compensation of all employees.

## VI. STATUTE OF LIMITATIONS

53. Defendants' conspiracy was a continuing violation of Plaintiff and Class Members' interests. Defendants repeatedly injured Class Members by abiding by, enforcing, and reaffirming their participation in the anticompetitive agreements. Discussions regarding compensation information and prohibitions of affirmative recruitment of other companies' employees continue to this day. These discussions were (and continue to be) conducted by phone, e-mail, and in-person meetings.

54. Plaintiff had neither actual nor constructive knowledge of the relevant facts until late 2010. The conspiracy was not (and could not have been) discovered through reasonable diligence until late 2010, when Pixar was revealed as one of the subjects of the DOJ investigation regarding non-solicitation agreements among high-tech companies. Previously, no visual effects or animation studio had been mentioned as part of that investigation.

55. Neither Plaintiff nor the Class had inquiry notice that there was a conspiracy to suppress wages by non-solicitation among visual effects and animation companies. The Defendants conducted secret meetings, and had agreed to not discuss the agreement publicly or in the presence of their employees.

56. The manner in which the non-solicitation agreement was executed demonstrates that it was designed to avoid detection. With the exception of certain outside executives and human resources and recruiting personnel, Defendants concealed and kept secret the wage-fixing and non-solicitation agreements. Moreover, Defendants consciously avoided discussing the agreements in written documents that might have been disclosed to the general public, or to the Class Members.

57. Defendants' explanations for hiring, recruiting, and compensation decisions were pretextual, incomplete, or materially false and misleading. Their explanations instead only served to cover up their illicit non-solicitation agreement.

58. Defendants seek to create the false impression that the decisions they made regarding hiring and compensation were independent. For example, Defendants have justified decisions by

COMPLAINT – No.

010177-12 722173V1

12

pointing to a survey conducted by a supposed independent third party. However, that independent third party, the Croner Company, facilitated meetings where salary and wage information was shared among visual effects and animation studios. Defendants also concealed the fact that they shared such information by phone, e-mail, and other secret means.

59. Any applicable statute of limitations has thus been tolled by Defendants' fraudulent concealment of their conspiracy.

## VII. CLASS ACTION ALLEGATIONS

60. Plaintiff brings this action under Fed. R. Civ. P. 23(b)(2) and (3) on behalf of himself and all others similarly situated. The Class is defined as:

> All persons who worked at any time from 2004 to the present in technical, artistic, creative and/or research and development positions for Lucasfilm, Pixar, DreamWorks Animation, Walt Disney Animation Studios, Walt Disney Feature Animation, Sony Pictures Animation, or Sony Pictures Imageworks, ImageMovers Digital, and Digital Domain, in the United States. Excluded from the Class are officers, senior executives, and personnel in the human resources and recruiting departments of the Defendants. Also excluded from the Class are the claims against Pixar, Lucasfilm, and Disney released in *In re High-Tech Employees Antitrust Litigation*, No. 11-cv-2509 (N.D. Cal.).

61. The Class is so numerous that joinder of all members is impracticable. While the exact number of Class Members is unknown to Plaintiff at this time and can only be discerned through discovery, Plaintiff believes that there are thousands of Class Members.

62. Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and other Class Members sustained damages arising out of Defendants' common course of conduct in violation of law as complained herein. The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct in violation of laws as alleged herein.

63. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action litigation, including antitrust class action litigation.

64. Common questions of law and fact exist as to all members of the Class which predominate over any questions affecting solely individual members of the Class, including:

        a.      Whether Defendants agreed to not actively solicit each other's employees, to inform other Defendants of offers made to their employees, and to limit counteroffers;

        b.      Whether Defendants agreed to fix wage and salary ranges for certain positions;

        c.      Whether such agreements were *per se* violations of the Sherman Act and the Cartwright Act;

        d.      Whether Defendants' agreements constituted unlawful or unfair business acts or practices in violation of California Business and Professions Code § 17200;

        e.      Whether Defendants fraudulently concealed their conduct;

        f.      Whether and the extent to which Defendants' conduct suppressed wages and salaries below competitive levels;

        g.      Whether Plaintiff and the other class members suffered injury as a result of Defendants' agreements;

        h.      Whether any such injury constitutes antitrust injury;

        i.      The nature and scope of injunctive relief necessary to restore a competitive market; and

        j.      The measure of damages suffered by the Plaintiff and the Class.

65.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Class Members is impracticable. The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action, on the other hand, would achieve substantial economies of time, effort and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

66.     The interest of members of the Class in individually controlling the prosecution of separate actions is theoretical rather than practical. The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable. The amounts at stake for

COMPLAINT – No.

14

1  Class Members, while substantial in the aggregate, are not great enough individually to enable them
2  to maintain separate suits against Defendants. Plaintiff does not anticipate any difficulty in the
3  management of this action as a class action.

<p align="center">**VIII.   INTERSTATE COMMERCE**</p>

4

5       67.     During the Class Period, Defendants employed Plaintiff and other class members in
6  California, and other states.

7       68.     Visual effects and animation studios exist throughout the country.

8       69.     These studios compete with other studios to attract skilled workers on a nationwide
9  level. These workers include Class Members who moved between and among states to gain
10 employment at these studios.

11      70.     Defendants' conduct therefore (1) caused antitrust injury throughout the United States
12 and (2) substantially affected interstate commerce.

<p align="center">**IX.    VIOLATIONS ALLEGED**</p>

<p align="center">**FIRST CLAIM FOR RELIEF**
**(Violation of Sherman Act, 15 U.S.C. § 1)**</p>

13
14
15
16      71.     Plaintiff realleges and incorporates by reference each allegation set forth in all of the
   preceding paragraphs in this Complaint.
17
        72.     Defendants, by and through their officers, directors, employees, agents, or other
18
   representatives have entered into an unlawful agreement, combination, and conspiracy in restraint of
19
   trade, in violation of 15 U.S.C. § 1. Specifically, Defendants agreed to restrict competition for Class
20
   Members' services through non-solicitation agreements and agreements to fix the wage and salary
21
   ranges of Class Members, all with the purpose and effect of suppressing Class Members'
22
   compensation and restraining competition in the market for Class Members' services.
23
        73.     Defendants' conduct injured Class Members by lowering their compensation and
24
   depriving them of free and fair competition in the market for their services.
25
        74.     Defendants' agreements are *per se* violations of the Sherman Act.
26
27
28
   COMPLAINT – No.
                                                   15
   010177-12 722173V1

**SECOND CLAIM FOR RELIEF**
**(Violations of the Cartwright Act,**
**Cal. Bus. & Prof. Code §§ 16720, *et seq.*)**

75. Plaintiff realleges and incorporates by reference each allegation set forth in all of the preceding paragraphs in this Complaint.

76. Defendants, by and through their officers, directors, employees, agents, or other representatives have entered into an unlawful agreement, combination, and conspiracy in restraint of trade, in violation of California Business and Professions Code § 16720. Specifically, Defendants agreed to restrict competition for Class Members' services through non-solicitation agreements and agreements to fix the wage and salary ranges of Class Members, all with the purpose and effect of suppressing Class Members' compensation and restraining competition in the market for Class Members' services.

77. Defendants' conduct injured Class Members by lowering their compensation and depriving them of free and fair competition in the market for their services.

78. Plaintiff and other class members are "persons" within the meaning of the Cartwright Act as defined in California Business and Professions Code § 16720.

79. Defendants' agreements are *per se* violations of the Cartwright Act.

**THIRD CLAIM FOR RELIEF**
**(Violations of California's Unfair Competition Law,**
**Cal. Bus. & Prof. Code §§ 17200, *et seq.*)**

80. Plaintiff realleges and incorporates by reference each allegation set forth in all of the preceding paragraphs in this Complaint.

81. Defendants, by and through their officers, directors, employees, agents, or other representatives have entered into an unlawful agreement, combination, and conspiracy in restraint of trade, in violation of California Business and Professions Code § 17200. Specifically, Defendants agreed to restrict competition for Class Members' services through non-solicitation agreements and agreements to fix the wage and salary ranges of Class Members, all with the purpose and effect of suppressing Class Members' compensation and restraining competition in the market for Class Members' services.

82. Defendants' acts were unfair, unlawful, and/or unconscionable, both in their own right and because they violated the Sherman Act and the Cartwright Act.

83. Defendants' conduct injured Class Members by lowering their compensation and depriving them of free and fair competition in the market for their services, allowing Defendants to unlawfully retain money that would otherwise have been paid to Plaintiff and other class members. Plaintiff and other class members are therefore persons who have suffered injury in fact and lost money or property as a result of the unfair competition under California Business and Professions Code § 17204.

84. Pursuant to California Business and Professions Code § 17203, disgorgement of Defendants' unlawful gains is necessary to prevent the use or employment of Defendants' unfair practices, and restitution to Plaintiff and other class members is necessary to restore to them the money or property unfairly withheld from them.

**PRAYER FOR RELIEF**

85. WHEREFORE, Plaintiff respects the following relief:

   a. That the Court certify this case as a class action pursuant to Fed. R. Civ. P. 23;

   b. That the Court appoint Plaintiff as class representative and his counsel to be class counsel;

   c. That the Court award the Plaintiff and Class Members all appropriate relief, including, but not limited to: Compensatory damages in an amount to be proven at trial and trebled thereafter; prejudgment and post-judgment interest as provided for by law or allowed in equity; a permanent injunction prohibiting Defendants from hereafter agreeing not to solicit other companies' employees, to notify each other of offers extended to potential hires, or not to make counteroffers, or agreeing with other companies about compensation or other terms of employment; the costs of bringing this suit, including reasonable attorneys' fees and expenses, and an incentive award to compensate Plaintiff for efforts undertaken to pursue this litigation.

   d. That the Court grant such additional orders or judgments as may be necessary to prevent the unlawful practices complained of herein; and

1          e.        That the Court award the Plaintiff and Class Members such other, favorable relief as may be available and appropriate under federal or state law, or at equity.

## JURY TRIAL DEMANDED

86.    Plaintiff demands a trial by jury of all of the claims asserted in this complaint so triable.

DATED: October 2, 2014                HAGENS BERMAN SOBOL SHAPIRO LLP

By   /s/ Jeff D. Friedman
      JEFF D. FRIEDMAN

Shana E. Scarlett (217895)
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
jefff@hbsslaw.com
shanas@hbsslaw.com

Steve W. Berman (*Pro Hac Vice pending*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

*Attorneys for Plaintiff*